Case 16-3310, Carla Marie Bartlett et al. v. E I DuPont de Nemours & Co. Argument not to exceed 15 minutes per side. Mr. Bergeron, you may proceed to the appellant. Good morning, Your Honor. Smith Police Department. I'd like to reserve three minutes of time for rebuttal. This morning, I'd like to focus on two fundamental contractual errors committed by the District Court. The first of these is that the court told the jury that the science panel found that 0.05 for one year causes kidney cancer. And that was simply inaccurate. And second... Did the court say that? Or in the 18 times that he instructed the jury, did the court not say that I'm instructing you that it is capable of causing? The court did say that, Your Honor, and we have the quote on page 26 of our brief where he did say that. He said other things throughout the course of... Is your position that... I don't want to get into counting times... Sure. But my review of the jury instructions is that his instruction, perhaps with the exception of once, always was that you will treat as proven in this case that Ms. Bartlett has established that C8 is capable of causing her kidney cancer. That was at the conclusion of trial, and as I read it throughout his 18 times, as I count them, of instructions to the jury, it was that it was capable of causing her kidney cancer. I think the overarching problem, Your Honor, is how he characterized the science panel report. The science panel report was characterized as making a finding that there is a connection, there is a link between 0.05 exposure and kidney cancer, whether you say capable of causing, whether you say causing. And we know that this confused the jury. We don't have to speculate on this because the first thing they did when they went out was they asked a question. They didn't just say, can we see the science panel report? They said, can we see the scientific report that determined 0.05? And there is no such report, Your Honor. Throughout the science panel's report, it conducts no analysis as to 0.05. It makes no conclusions based on 0.05. It certainly doesn't make any causation finding. Fundamentally, what the district court was doing was conflating the probable link determination with causation, but not just general causation, specific causation as well. And this all relates to the issue of dose because the court was looking at 0.05, which was the class definition. That's all it was. It doesn't appear anywhere else throughout the agreement. Okay, counsel, you say that there was confusion, that the court confused the jury by the nature and extent of the instruction. And you seem now to question whether or not that there was any linkage between the 0.05 and the possibility of causation. But what would have been, in your mind, an appropriate instruction on that point with respect to the science panel? Your Honor, I think that's an excellent question because this really illustrates how this case should have proceeded. And with the probable link determination, really there was no need to get into the science panel report at all. It simply would have been, it is the trigger for the general causation concession by DuPont. So they would have said, the court should have said, a probable link determination has been made, therefore you should treat general causation as undisputed for this case. Instead what happened was the science panel report kind of became like the Wizard of Oz. It was mysterious and authoritative, but the jury never could kind of peek behind the curtain and see what it was. And that's where the concession result came from. So I want to begin and ask, did DuPont offer the, quote, model instruction that you just tendered as an instruction to be given in this case, which was subsequently rejected by the court? Did you offer that instruction? Did the court have an opportunity to consider your model instruction, if you will? We did, Your Honor, and if you look at page 82213 of page ID, that is where we preserved all of our objections to the instructions. We submitted an instruction prior to that, and the judge recognized in DEMO 12 that we had preserved all of our objections to that instruction. Okay, and going back to Judge Strange's point, why isn't the judge's curative instruction sufficient under the DEMO 12? Why isn't it sufficient under this court's jurisprudence to cure that one misstatement of the instruction that you have highlighted? Well, for two reasons, Your Honor. First, because we saw the jury confusion by the question that they asked, and second, because we're not just talking about an isolated comment by the district court. We're talking about an overarching problem here, and getting back to your earlier question, there is simply, the science panel did not find that any linkage between .05 and kidney cancer. What they were looking at was increasing risk with increasing exposure. And remember, the science panel was looking at blood levels, they were not looking at water levels. The .05 is the water level, the background C8 concentration in the water. The science panel was looking at blood levels and evaluating those, and what it was talking about was the increasing risk based on the increasing dosage level that we see in the individual's blood. Wasn't that a matter of evidence at the trial, though? Wasn't it evidence at the trial that Bartlett's blood test in 2005 showed that the C8 in her blood placed her in the 99.6 percentile, meaning that only .04 percent of those tested in the United States had higher levels? Just on that point, that was comparing to people in the background, so not people in the water district. If you compared her to people in the water district, females in her age bracket, she had 19.5 and the average was 82, so four times higher than her. Four times higher, she was within the 99th percentile in the nation. And she was in the lower category of the people who were exposed within this class. And that's why it's significant, because the science panel's finding... And did that evidence come in also? That did come in, Your Honor, but the point is, what we were not able to discuss was explaining where she fit within the epidemiological studies and what that said for her risk level. I guess I'm struggling with the concept here, because what happened in this case is a very unusual settlement agreement. This is not your traditional epidemiological study, which I think that generally begins, I want to make sure I'm saying it right, with a chemical exposure and then seeks to define what dose causes. That's traditional, but here the agreement specified that this was going to be a study that was to begin with a defined group, 80,000 people, and then a defined exposure, .05 parts per billion for a year. And the instruction was to determine which diseases are linked to that exposure in that group. So you're outside the way normal epidemiological tests work, because you created one in your own document. And where I'm struggling is that it seems that the objection is, we want to bring in toxic tort law standards. And my question to you is, how do you bring in toxic tort law standards if you've already contracted to use a different standard in this particular case? Your Honor, I don't think we did, and here's why. There's nothing in the contract that says the science panel is supposed to make its determination solely based on .05. And remember, because that is the water level, that says nothing about what is in the individual's blood. And that's what the district court in the Rhodes case recognized. Looking at the same agreement, it said this .05 tells me nothing about causation and nothing about what's in actual individual's blood levels, which is what the science panel was... But that information came in. I mean, that information is part of what your experts were allowed to put in. I'm struggling to understand, if this is your argument, that we ought to be able to step back into general toxic tort law, then what was your agreement to say that general causation was established? You've got a bargaining deal. You're working together. This contract said, I've got 80,000 people. We're going to select the diseases that are linked, and if you aren't in those, you are giving up your rights to bring any cause of action whatsoever, no matter what is in your blood. You're done. So now you're down to 3,500 people that are in the potential class. A huge reduction. And the deal is, general causation is established, specific causation must be proven. So I'm struggling with what you think that general causation grant in this negotiation could even mean. Well, I think if you look at what general causation generally means, it is usually the most hotly contested issue in a toxic tort case. Many plans wouldn't even get past summary judgment. And here, if you look at the science panel's work, it took them seven years just to come up with a probable link finding. So it shows how complicated this is, and how the plans would have to go through every single case, every single disease, and prove that up. So the general causation concession... But they would have the opportunity. But based on this, they no longer do. But my point is, that is the significance of the concession, is that it simplifies their burden and makes their case much easier, because the focus is just on specific causation. It makes yours also, because you do not have to hire experts to come in and say, no, it's not. So everybody just takes that off the table. And wisely, it seemed to me, the goal of this is to simplify and streamline the case. Go ahead. But we lose our defense. We lose our defense on general causation, and that's why the concession is significant. And so then the issue is, well, what did we get? What did we preserve on specific causation? And what the district court held, getting back to your question about the experts, they can go through and do a differential diagnosis and conclude that it's C8. But we cannot go through a differential diagnosis and conclude it's anything other than C8. And we cannot then show... The testimony is in the record that this very illness is caused by morbid obesity. There's a significant amount of evidence that came into the record on other causation, and I guess that's where I get back to this jury instruction that says that general causation is established, but you will still decide whether Ms. Bartlett has proven all the elements of her claim, and that in her case the kidney cancer was caused by C8 and not some other cause unrelated to C8. Why doesn't that give you what you need? Because her expert was not allowed to come in and say, I have an opinion that it is more likely than not that obesity was the cause of her cancer. The judge did not allow Cohen to say that. They openly mocked Cohen during cross on that point and got up in closing argument and said, no one walked through the courtroom doors and offered an opinion on causation. So while we got some evidence in on obesity and some on dose, our experts were not allowed to connect the dots and bring it home to Mrs. Bartlett. And as a result of that, the jury didn't get a chance to reject the opinions because the opinions were not offered. And that, correct me if I'm wrong, but that in the face of the agreement having said not only... I mean, I'm struggling with this as well, but I may be struggling coming at it from a different perspective here. But where the agreement said general causation shall mean that it is probable that the exposure is capable of causing the disease, and then probable link was defined as meaning it is more likely than not that there is a link between the exposure and the particular human disease. And then the court's saying at one point, so you won't be deciding that first question of whether or not C8 in that dosage for over a year causes kidney cancer. Did the panel ever actually say in its findings, in that dosage it causes cancer? Absolutely not. And that's part of the issue, Your Honor. And it really begs the question of what is left for us, reserved right under Section 3.3 of the agreement, in specific causation? Because if we can't rule C8 out for an individual, and if we can't point to alternative causes and have our expert come in and say, this is what is most likely the cause of her cancer, what is left? The district court never satisfactorily answers that. They don't answer it in their brief. And that really is the heart of the problem. Is there any point in the individual trials, if that's the way this is going to work? Well, Your Honor, it's a good question. I mean, that's part of the difficulty, because all we can really do is nitpick at what the plaintiff experts are saying, but our experts are not allowed to come in and offer the testimony that I've described to you. Thank you, Your Honor. Thank you. Good morning, Your Honors, and may it please the Court. I'm John Nalvandian on behalf of AFL-E, Carla Marie Martlett. Your Honors, let me start with that point about the experts. You know, they have a strategy. Their strategy is to say that we don't think C8 is capable of causing kidney cancer. And if their expert is unwilling to rule C8 in as a possible... Well, where in the record have they said, I mean, they signed the agreement that says if the panel finds that there is a link, then that's the end of it. So where in the record are they saying we don't think it can cause... Their expert, Dr. Cohen, says in his report, and Judge Sargis talks about this at length in his opinion, that he's unwilling to say, he says, I've never seen kidney cancer as a cause at this low dosage. And he's unwilling to rule it in as a possible cause, and if he's unwilling to rule it in, then Judge Sargis said, I can't accept... The panel didn't ever say at this dosage that it is a cause. It said that there is a probable link starting at this dosage, right? Yes. So the panel was evaluating this particular class defined by .05 for one year. The panel studied this class, 69,000 people. I'm wrong, I thought it was 80, it's 69,000. I'm sorry, 80,000 in the class, 69,000 of them signed up to have their blood tested, medical records. So this is one of the largest epi studies in history, we think. The science panel looked at that, and their charge was to figure out whether there was a probable link between that exposure and disease among the class members. So do you, in your view, is a probable link, at this dosage, a probable link, is that equivalent to it caused it? It triggers the concession from DuPont on general causation, which means that it's capable of causing it. So the distinction is it's capable, so an expert says, well, but at this dosage, I've not seen it. Okay, but it's capable, because the panel said it's capable, and DuPont says it's capable. But how does DuPont get from there to any specific case of challenging whether in this case, at this dosage, it actually caused it? Let me, I'll explain that, or I'll try to explain it. I don't think they've ever conceded that CA at these dosage levels is capable of causing any disease. It's my understanding and my reading of their experts, and what they've argued, and their strategy, and in all of these cases, they don't think that it causes, it's capable of causing anything. So I don't know what they would say, or what class member they would be willing to concede that I haven't seen it. But getting back to your question, Your Honor, the question is specific causation. What would they be allowed to say? What did they preserve with specific causation? They preserved two things. They preserved the ability to argue that something else caused the disease. Well, but they can't argue it unless they can put on evidence. Right, but let me explain that. C8 is one of the things that's capable of causing the disease. Let's say obesity is another thing. So they're allowed, if they rule in C8, by this agreement, under differential diagnosis, if you rule in C8, then you look at these two things, and you weigh them, right? You figure out what their argument is, well, this is morbid obesity. So they can put other things on the scale, if you will. Obesity, age, she ate lunch at a dry cleaner, heredity, whatever it is. The other thing they can argue is the relative weights of those factors. That's where dosage comes in. That's where, oh, she's so morbidly obese that she's a three-pack-a-day smoker. I mean, that's what their expert testified to at trial. So you can argue the relative weights, you can have additional causes. What you can't do, and what their expert did, and what their strategy is, is to take C8 off the table. Their expert is unwilling to say that it's capable of causing kidney cancer at the dosage that defined the class that was part of the settlement agreement. And the court drew this from Tamaraz. Am I pronouncing that correctly? How differential diagnosis works? Among other things. There are a lot of cases in the Sixth Circuit that talk about differential diagnosis in toxic tort cases. But normally what you do is you rule things in using general causation studies. You would go out and find studies that say smoking causes lung cancer. And you would rule that in as a possible cause, and you would look at other things. And then you may do a comparative analysis. If you leave in the expert opinion what the study of the scientific panel has ruled as a potential or a probable link to this. Exactly. And that's where we get back to this question. What the science panel did when they found the probable links, and what DuPont agreed to, in effect, is that you were going to rule C.A. in as a possible cause, as capable of causing for the six diseases that they found the links for. So then preserving your right then to argue about, and I would assume that means present evidence with regard to, specific causation as to a specific individual. You're saying that the only way, and please don't let me say you're saying something you're not, but it seems to me you're saying that the only way that an expert could testify as to specific causation with regard to a specific individual is if he starts by saying, yeah, it was C.A. or it might well have been, but in this particular individual's case, it's more likely than not that it was something else. Could they have done that? Yes, the expert by contract... Was the expert permitted to do that in this case? Was he permitted to? Dr. Cohen was unwilling to rule C.A. in as a cause, as a possible cause. That was the problem with his opinion and with the two other ones, and Judge Sargis talks a lot about this. I think it's in EMO evidentiary one or two. He says, look, you're starting from the wrong place. You're not ruling in. You agreed by contract that you would rule this in, in the analysis. And now your experts say, well, no, I've never seen that. I don't think that's right. Okay, well, then your differential diagnosis in this case, in this case, right, not every general causation, not every toxic tort case, but in this case, that's not going to work. Because you agreed that it was going to be capable of causing. Once that link was found, it triggered the concession. But on the other hand, the district court said, well, at this dosage level, it causes cancer. That's been established. That's not what the panel said. He said one, I believe it's one time, and Judge Sargis addresses this at length in his post-trial opinion. He says, you know, 18 times I gave this instruction that said it was capable of causing cancer. And one time he said, essentially, I misspoke and said it causes it. It would have been nice if you had objected and told me, hey, Your Honor, could you reword that? But you didn't. And he said, it doesn't really matter because I instructed the jury enough. They understood that it was capable and that it wasn't something that was anything more than that. I mean, it wasn't, he wasn't directing a verdict. He wasn't telling them you have to find that this causes it, that it's a specific causation. He said repeatedly, this is capable of causing kidney cancer, but DuPont can argue that it did not cause kidney cancer in this case. And they did argue that. Again, they argued about obesity. They argued about dosage. So those were the things that they could do, and they did. What was the extent, and I'm trying to remember this. What was the extent of the expert testimony that was presented with regard to this particular, Ms. Bartlett, on other things that might have, could have caused this? There was extensive testimony about obesity. There was some testimony about some other family history and some other things. But the main focus, in terms of an alternative cause, was on obesity. And they went through studies, epidemiological studies, about the relationship between obesity and kidney cancer. And they talked about how if you have a certain BMI, you're two times more likely, you're three times more likely. And again, he said, I can't remember what it was, five times more likely something. He said that was the three-pack-a-day smoker analogy, which they used in their closing. And so the jury heard all that. Now, did the jury hear Dr. Cohen say it was more likely that obesity caused it than C8? No, he wasn't allowed to say that. Why? Because he wouldn't rule C8 in. I mean, I keep getting back to that, but that's what happened. They don't want to say that C8 is capable of causing any of these diseases at this exposure level. And that's what they agreed to in the settlement agreement. I mean, this settlement agreement is, I mean, they talk about the .05, where'd that come from? It's in the agreement, right? I mean, this settlement agreement resolved class claims, individual class claims, personal injury, other claims, among these people, specific population. And then they turned around and studied this population. They defined them by their exposure to C8. So that's where it comes from. And the science panel says, look, this is what we were charged with doing. We went out into this community and studied these people to figure out whether there was a link between exposure of these people and these diseases. So it's all about the class and .05. That's what this agreement is. And it doesn't make any sense. The concession that we made where we gave up the claims, the other claims that were not probable links, that doesn't make any sense unless it applies to everybody, right? I mean, that's the point, is that if you don't find that there's a link at this exposure level, then everybody in the class who has that possible claim, they've released it. And we've done that. Sixty whatever it is, how many tens of thousands of claims that we don't have now. So I can talk about the agreement, but I don't have anything else to say on the agreement. You've answered my question. Okay. There have been a couple of other issues that they've raised they haven't talked about yet. With regard to the experts, we think that Judge Sargis addressed all of that in his opinion. There's a specific question about the precautionary principle I know they've raised. We think that that was certainly permissible here. Dr. Siegel was testifying about essentially what existing industry standards were and whether DuPont was measuring up to those standards of care. Not in a legal sense, he says, but in a more general sense. And that, of course, elucidates the legal standard. And I think that there are plenty of cases where expert testimony is required on standards of care. I will say this, this case was tried about essentially on negligence. What did DuPont know, when did they know it, and what did they do with the information? And they've repeatedly used the word precaution in their own testimony, in their opening, in their closing. They talked about precautions that they took. I mean, this case was about their actions and their conduct. And so I don't think that complaining now about the precautionary principle makes a lot of sense. And then finally, on the Ohio tort reform issue, which is a question about whether the caps apply or not, we think that's an eerie question, obviously, and that the cases that we've cited, Blair v. McDonough is one of them, and the Sorensen case is another, that answers the question. I understand the federal courts have had some dispute about that, but we believe that injury and conduct in this case, and the settlement agreement in this case, all took place before that statute went into effect. And that takes care of that issue. There are no further questions? There are not. Thank you. Your Honor, what Mr. Nalbandian said about what we are allowed to do for specific causation is inconsistent with what Judge Sargas ruled. The problem is, Dr. Cohen did rule in C-8 in his analysis, and he ultimately ruled it out. He ruled it out because of the level of dosage and how that compared to the epidemiological studies. But how does that comply with the agreement if he ruled it in and then ruled it out? Because I understood that just as a baseline for this particular class, it had to be considered as a possible cause. So if that's the case, how do we comply with the agreement? Well, Your Honor, of course it has to be considered a possible cause, but then it doesn't have to be the cause for this individual. That's the heart of specific causation. And we should be entitled to present evidence to show it's not the cause in this particular circumstance. And if you have specific sites to the record, that would be useful. It's in there somewhere, Your Honor. You just said that Cohen first ruled C-8 in as a possible cause, which does seem to me to be in compliance with the general causation requirements in the contract, and then ruled it out. What exactly do you mean by, and then ruled it out? What I mean is when going through his differential diagnosis and considering the possible causes, when he was evaluating C-8, he said, this is not the likely cause of Mrs. Bartlett's kidney cancer and here's why. He was looking at the dosage level that she received and comparing that to the epidemiological studies. And that's what I mean by saying ruled it out. Other epidemiological studies, is that correct? Yes, Your Honor. Outside ones. Yes, I believe that's true. Well, if that's the case, then why can't all of the 80,000 people who were excluded from the ability to bring a case come in and say, in my situation, you didn't link me up, but I have another epidemiological study that says that there is a connection, so I want to sue you. And, Your Honor, I just looked at it. He did consider the science panel's work, too. Who also, I know, but... Right. But the point is, Your Honor, for someone that said, let's say I had a super high dose of C-8 and I do not have a linked disease. If I can't even clear the threshold for probable link, there's no way that I can then show general causation, much less specific causation. Well, no, it is because of the way the contract was entered, it seems to me, that here are the parameters we are agreeing to. And if you don't make the grade in this one year of exposure at this level, if it does not come up with being a linked disease, I don't care that other outside studies would give you a claim. That's the quid pro quo. Those 75-plus thousand people gave up their right, it seems to me, to do what you want to do now against the 3,500 who are in the class. Tell me why I'm wrong. Your Honor, I respectfully disagree, and the reason is because this is the whole... This is why we preserve specific causation. That wasn't a concession that we've conceded liability on all of these cases. I mean, we clearly broke it up between general and specific causation, and you look at the background case law on specific causation, where it says dose is a critical component of this. And what Judge Sargis did was he took dose out of specific causation and put it in general causation, and therefore... I'm struggling to understand that, because if you had instructed your expert to say, you must say that C8 is capable of causing this disease, and if he had done that in his report, then he could have said, yes, we concede that it is capable, but I'm going to tell you what really caused it. And then he could have testified as he wanted to. Only the parts of his expert report were excluded under Daubert that refused to say that C8 could be a probable cause. And it seems to me that that was a choice. Your Honor, my reading of the Cohen report is he did exactly what you said we should be entitled to do, and yet it was still excluded. And I think that's kind of the frustration as we're confronting what our experts can and cannot say. Well, let me ask you this, then, because believe me, you've got three people here who are going to be reading that report again extremely carefully. But if, in fact, in the Cohen report, he did not concede that C8 can, is capable of causing this disease, kidney cancer, would you agree with Judge Stranch that there's a real problem with admitting the rest of what he was saying? Your Honor, I don't think so, and the reason is because his analysis was not on general causation. He was not supposed to be an expert on general causation. He was supposed to look at specific causation. So you start from the premise that, you know, I'm just looking at specific causation, and that's what his analysis was about. It wasn't supposed to get into general causation issues. And that's why the earlier question about, well, how does the science panel report work in practice? You know, look, we get the probable link is the trigger for the general causation concession, and then we try the case on specific causation. That's what the case should be about, and that's what we believe Dr. Cohen's report was about. And his testimony was obviously excluded by the district judge. Thank you.